DowNey, Judge,
delivered the opinion of the court:
After the cancellation of the contract and supplemental contracts which had been entered into between the United States and the Atlantic, Gulf and Pacific Company for the construction of a dry dock at the Philadelphia Navy Yard a contract was made with The G. M. Scofield Company for the completion of the dock in accordance with the contracts of the Atlantic, Gulf and Pacific Company, and certain supplemental contracts with said Scofield Company were also entered into.
The Scofield Company performed the major part of its contracts by the completion of the dock proper and the installation of most of the machinery, but before it had finally completed its work it became embarrassed financially, went into bankruptcy, and soon thereafter, when satisfactory progress was not being made in the completion of the dock and its appurtenances, its contract was canceled, and the dock, together with all the materials, supplies, and machinery on hand, was taken over by the United States, and through- the *439 Bureau of Yards and Docks they proceeded with the completion of the dock at the expense of the contractor.
There were retained percentages in a considerable amount due the contracting company, and when the work had been finally completed by the United States it rendered a statement in which it charged against the retained percentages quite a number of items of expense alleged to have been incurred in the completion of the work. With reference to many of these charges the plaintiff makes no question. As to seven items plaintiff contends that the charges were improperly made and seeks recovery. Those seven items are as follows:
2. Placing the filling required by contract_$1, 577. 58
U; Three main engines_ 58,775.42
13. Repairing stokers_ 215.28
14. Providing anchor bolts for foundation of engine_ 96.16
15. Providing and installing gauges, etc_ 162. 80
19. Substituting larger and approved engine in caisson_ 2,182. 50
27. Maintaining dry dock and appurtenances_ 4, 917. 95
In addition to these the plaintiff seeks recovery also for the charge made against it of $2,851.20 on account of gravel theretofore paid for, $2,628.31 on account of redredging not paid for, and the balance of $11,365.43 shown by the final accounting to be due and unpaid.
The findings as to some of these items so speak for themselves that but little, if any, discussion is necessary.
With reference to the deduction of $1,577.58 as to alleged cost of completing the fill which the contractors were obligated to make, it clearly appears that this fill was not made because of the failure of the United States through its separate contractor to complete the sea wall which was to retain a part of the fill and without which the fill could not be completed. The contractors, in order that they might perform their contract in this respect as fully as might be, constructed at an expense of $250 a temporary dike inside of the line of the proposed sea wall to hold the fill, and when they had filled to- the required height against that dike it is plainly apparent that they had done all which, under the circumstances, they could do. The contractor for the construction of the sea wall so delayed his work that it was not completed until approximately a year and a half after the ex *440 piration of the contract period, and not until after the Scofield Company had become involved financially, had gone into bankruptcy, and their contract had been canceled. It is found, by deduction, that it would have cost that company $740.38 to complete the fill had the sea wall been in place. A statement of the facts seems to be all that is necessary to justify the conclusion that there should be a recovery of the excess charge of $837.20 and also of the $250 expended in the construction of the dike erected to facilitate the progress of the work and made necessary by the absence of the sea wall.
The next item is much the largest of all the contested items and gives room for more of controversy. The record is replete with correspondence, expressions of opinion, reports of tests and various matters of that sort from which we have drawn conclusions, but which we have not found it necessary to incorporate in detail in the findings.
It appears to our entire satisfaction that when the contract was made for this dry dock, which carried with it detailed specifications and among them the'specifications for two engines by which the dock was to be operated, it was then intended that these engines should perform solely the work necessary in connection with the operation of the dock; that is, so far as they were concerned, its pumping. The record bears evidence of some uncertainty in the minds of those in authority as to exactly what was desired to be accomplished at the Philadelphia Navy Yard. When the contractor first informed the Chief of the Bureau of Yards and Docks of the awarding of the contract to the Great Lakes Engineering Works for the two engines required they were informed that changes in the power plant were under consideration. They were afterwards notified that it had been determined not to make changes but to abide by the provisions of the original contract. Again, later on, the matter of the changes presented itself. A board was appointed to investigate and recommend, and changes were determined, upon. The change, so far as engines are concerned, excepting some matters of minor detail, consisted in the addition to the power plant of one more engine, specifically of Great Lakes Engineering Works’ manufacture, and of the type *441 called for by the original contract, and already under contract as between the Scofield Company and the Great Lakes Engineering Works.
It is quite apparent that this change in power plant was for the purpose of accomplishing something more than that for which it had been originally designed and intended; that is, the installation of a centralized power plant which, in addition to the pumping of the dock, should perform the added functions of furnishing heat, light, and power for the whole yard; and, in this connection, we are also impressed with the idea that when these engines were being subjected to official tests there was always present in the minds of those making these tests the idea, not simply that they were engines to be used for the purpose for which originally intended, but that they were to constitute a power plant for other and different purposes. To the nonexpert it also appears entirely possible that an official test might demonstrate satisfactory efficiency in an engine designed to pump a dock and not demonstrate the same degree of satisfactory efficiency in three engines necessary to be used in parallel and for entirely different purposes. But if it be possible that any of the difficulties encountered in connection with the satisfactory operation of these engines was due to the fact that they were not of a suitable type for the performance of a service other than that for which they were originally intended, it would seem that, so far as the type of engine is concerned, the defendant had foreclosed itself when it specifically, by supplemental contract, provided for the addition of a Great Lakes engine of the same type as those already under contract.
While we must credit those in charge of this matter on behalf of the United States with entire good faith in their procedure we are not required to overlook or to eliminate from consideration in reaching a conclusion some of the peculiarities attending their procedure.
When the contract with the Scofield Company was canceled the engines were then placed; they had been used repeatedly in connection with the docking of vessels and had satisfactorily performed the service required of them. It is to he conceded, however, that in some respects they did not *442 at this time comply with the specifications. The principal fault found with them up to this time was the fact that they did not regulate properly; that is, they showed more variation in speed upon change of load than the specifications permitted. We are of the opinion that the test to which the engines were subjected in this respect involved a misconstruction. of the specifications and required more than should have been required. This idea is sustained to some extent by the fact that there was a change in the supplemental contract with reference to permissible variations, but conceding that the engines at the time in question did not comply with the specifications the procedure thereafter is for consideration.
Undoubtedly, at this time, the engines might have been rejected. They were not. But after the work was taken over by the United States and the Scofield Company prohibited from any further operations in connection therewith the obligation of the Great Lakes Engineering Works, under its contract with the Scofield Company to furnish engines which would comply with the specifications, seems to have' been recognized, and for a time the representatives of the engine builders were permitted to proceed with their work, designed to correct the defects in the engines. However, before they had accomplished the purpose or indicated their inability so to do, the Bureau of Yards and Docks concluded to. take upon itself the burden of making these engines satisfactory. After correspondence with several concerns expert in that line of work the bureau entered into a contract with the Providence Engineering Works, under which that company obligated itself to make these engines comply with the specifications stated therein, evidently satisfactory to the bureau, and under which contract they were not entitled to receive any compensation except at the option of the United States until they had fully performed the contract. They made certain changes in one of the engines, their work being limited to one engine at a time so that the others might still be available for pumping the dock, and it was subjected to test. The naval board found an excessive steam consumption. A competent engineer representing the plaintiff herein made a test thereafter in connection with *443 wbicli he determined that the steam consumption was well within the specifications. In the face of conflicting testimony upon this question it is for the court to determine the fact, and the record, taken as a whole, with respect to the conditions under which the various tests were made, seems to us to justify the conclusion that there is at least a failure to satisfy that the tests of the naval board for steam consumption were made under such conditions as to demonstrate accurate results. It may not be improper to observe in this connection that there is much of technical matter in the record with reference to these various tests which furnishes to the nonexpert but little basis for a satisfactory conclusion and which it is entirely possible is of little practical value to the expert.
Aside from the question of steam consumption the naval authorities concluded that there was yet some unsatisfactory operation in this remodeled engine and the Providence Engineering Works represented that the remaining defect could be cured by the use of an additional check valve, which it proposed to install. Peculiarly, and in the face of this suggestion by that company and in spite of the terms of the contract with that company, under which they were obligated to produce the desired results or receive no compensation, the authorities terminated the contract with the Providence Engineering Works, paid that company a considerable sum for the work it had already done, and rejected the engines over the protest of the plaintiff herein.
It would seem that little more, if anything, need be said on this question. Having undertaken to correct the faults in these engines at the expense of the Scofield Company, and having manifested sufficient faith in the ability of the Providence Engineering Works to justify a contract with that company such as was made, we are unable to comprehend the basis upon which those in charge for the United States were justified in discrediting the ability of that company by slight further modifications to perform its contract and in terminating that contract under such conditions as imply a right to charge the expense incurred to the Scofield Company without the possible accomplishment of results to their benefit, and in then rejecting the engines. It plainly appears *444 that the Providence Engineering Works had accomplished a large part of the work which it had contracted to accomplish, and no satisfactory reason ap pears in the record to justify an assumption, in the face of their own declaration on the subject, that they could not remedy the remaining defects. Since the United States had elected to take this course in the matter it would seem that a rejection was not justified until the Providence Engineering Works had failed to accomplish the desired purpose or there was some reasonable basis for the conclusion that it could not do so. We have found that it does not appear that the engineering works, if permitted to proceed as proposed by it, might not have removed any remaining defect in the engines as it asserted that it could.
After the rejection of these engines the defendant contracted with another concern for other engines which were of a different type and as to which there were material variations in the specifications from those provided in the original contract, and the cost of these engines in the final statement submitted has been charged against the retained percentages due the Scofield Company. We can not in this connection but observe in the record the fact that in connection with the completion of this dock at the expense of the contractor those in charge were warned by superior authority that in order to charge the Scofield Company with the expense incurred the work must be done substantially as called for by the contract of that company.
As bearing on the general question of the efficiency of these engines, even in the condition they were in before being remodeled by the Providence Engineering Works, although strictly not up to specifications, it is noticeable that in connection with the contract for the installation of the substituted engines it was required that the rejected engines should be taken down and new ones substituted one at a time, to the end that during the progress of the work of substitution and until new engines were ready to assume the burden the rejected engines might still be available for the purpose for which they were originally intended.
We have concluded that the charge against the retained percentages due the Scofield Company of the cost of the sub *445 stituted engines was unjustified, but upon the theory that they did not as originally furnished comply with the specifications, and that the United States was justified in incurring and charging against the Scofield Company the necessary expense of making them so comply, which it undertook to do, and that had the Providence Engineering Works been permitted to complete its work under its contract to remedy the defects in the engines the amount then payable to said engineering works under its contract would have been a proper charge against the Scofield Company, the charge of the cost of the new engines should be offset to the extent of $8,400 contracted to be paid the Providence Engineering Works.
Charging to the contractor the item of $8,400, it is apparent that the item of $3,611.94, paid to the Providence Engineering Works for work included in the contract price of $8,400, should not be charged. If, as we conclude, the engines were improperly rejected, the items of $1,649.48 for removing and storing, and the item of $4,364.98 for-modifying foundations, were improperly charged. The items of $2,827.06 for oil, drip, and water piping, and $5,146.43 for exhaust piping and electrical connections are practically without explanation, except such as appears in the statement of the items. The defendant has not shown us the basis of and the justification for the charges. So far as we can gather any light from the record it tends to the conclusion that these items, except as to electrical connections, may have been for work the contractors for the substituted engines should have done under their contract. If they were for work done in connection with the installation of the rejected engines the fact shoud have been shown. There is no showing separately as to any expense for electrical connections properly chargeable to the Scofield Company. We are unable to find in the record any facts supporting the charge of the remaining items amounting to $359.63. As to such charges against the contractor, under the circumstances, the burden is on the defendant. This disposition of the charge on account of the substituted engines requires the elimination, or the setting off, of the credit given in the sum of $3,100 for the proceeds of the sale of the rejected engines *446 included in which is also the proceeds of the sale of the caisson engine hereinafter referred to.
The Scofield Company, under its contract, furnished certain stokers which were used in firing the boilers. Some time after the employees of the Scofield Company had been withdrawn and the employees of the United States had been operating the power plant, it was discovered that the stokers were considerably damaged. They were repaired at the expense of $215.28, which was charged to the retained percentages due the contractor. It does not satisfactorily appear that the Scofield Company or its employees were responsible for the damage. It may as well be concluded, in the light of all the circumstances, that they were damaged when being operated by employees of the United States. Under such circumstances, there is no justification shown for the charge as made.
Under the supplemental contract the Scofield Company was required to furnish a fourth engine foundation. This it did; and, in constructing it, the company left pockets therein for the insertion afterward of the anchor bolts. No anchor bolts were furnished it by anyone for insertion in the foundation, and anchor bolts could not properly be set into the foundation until the type of engine, its dimensions, etc., which was to be placed on the foundation, were known. It does not appear that there has ever been any engine .placed upon this foundation, nor that there have ever been any anchor bolts set. The anchor bolts charged against the contractor’s retained percentages, at $96.16, were made in the yard. Why they were made at a time when it could not be definitely known what their proper size should be and when they could not be properly set in the foundation is problematic, unless it was for the purpose of assisting in mar-shalling the charges which it was thought proper to make against the contractor. Objection is made that there is no showing in the record, aside from the charge itself, as to the cost of these anchor bolts, and the objection is not without force, since the burden in this respect would seem to be on the defendant; but, aside from that, we think we are justified in applying such common knowledge as may be avail *447 able on the question, and in suggesting that where foundations for engines are being installed by one contractor and the engines furnished by another contractor, it is the usual practice for the foundation builder, following a plan furnished by the engine builder, to set the anchor bolts, which are also to be furnished by the engine contractor. This view of the usual rule is strengthened by the fact that the contract of McIntosh, Seymour & Company, for the new engines, requires them to furnish the anchor bolts, and nothing appears in the Scofield Company’s contract to the contrary. We conclude that the charge is not justified.
It is found that certain glass fittings for gauges which were required by the contract to be furnished by the Scofield Company were not so furnished and it follows that the charge therefor of $162.80 was a proper charge.
With reference to the caisson engine there is much of detail in the record which is not recited in the findings but which is the basis of the conclusion stated therein. We have found that the rejection of the caisson engine furnished by the Scofield Company and the charging against the retained percentages due that company of the cost of the new engine substituted therefor was not justified. As against this charge, however, there should be offset the proceeds of the sale of the rejected engine which was credited to the Scofield Company, but that amount is included in the $3,100 item heretofore considered and does not separately appear.
There was a charge made against the retained percentages of $4,917.95 which is indicated in the statement as for “ maintaining dry dock and appurtenances.” This was subsequent to the time that the United States cancelled the contract with the Scofield Company and took charge of the dry dock, and during the time when it was being used almost constantly by the United States for the docking of ships. We are not furnished with any evidence as to the details of this charge, but the basis upon which it is made as against the Scofield Company is assumed, we take it, to be that the Scofield Company was liable for any expense incurred by the United States in caring for and operating the dock until its final acceptance. Even if this theory were correct, we think it incumbent upon the defendant to present such *448 evidence as would justify the conclusion that the charges made were proper charges. It has not done so, and, on all the facts found, we conclude that the charge is improperly made.
The contract with the Scofield Company contemplated that wherever gravel in given quantities could be found within a given part of the yard it should be used by the contractor. There was also an agreement as to the price to be paid the contractor for such gravel as it was necessary to procure elsewhere. After the execution of the contract and about the time the Scofield Company was beginning its work it was plainly apparent that there was but a small amount of gravel available in the yard, and a contract was made by said company for the furnishing of the necessary gravel from outside sources. Thereafter there was paid to the Scofield Company $2,851.20 for gravel furnished from, without the yard. Some time after the execution of its contract and after it- had contracted for the furnishing of gravel from outside sources there was a .considerable quantity of materials, gravel included, pumped into the yard in connection with dredging operations being carried on in the Delaware River. The charge made against the contractor in' the sum stated above was upon the theory that it was obligated, under its contract, to have used out of the yard the amount of gravel represented thereby. Such question as there may be in the matter, if any, would seem to be disposed of by the fact that this gravel was.not available in the yard at the time this contract was entered into by the Scofield Company, nor could that company anticipate that supplies of gravel would later be available by reason of dredging operations or that it was required to use any other gravel than that available at the time the contract was entered into. Procedure would seem to indicate that this was the view of the matter first taken by the representatives of the United States since the charge is a charging back of a payment theretofore made for outside gravel, and that the idea that the dredged gravel was within the contemplation of the contract was an afterthought.
*449 The claim for redredging the dock entrance in the sum of $2,628.31 quite clearly speaks for itself under the facts found. The only point in controversy with reference to it seems to have been whether the redredging was necessary by reason of the carelessness of those for whose acts the Scofield Company was responsible. The materials dredged indicate quite clearly that the filling which necessitated redredging was by reason of the natural action of the river in washing silt into the channel, and the Scofield Company was plainly not responsible therefor.
The final item of $11,365.43 is an unpaid balance of retained percentages conceded to be due.
Upon the whole case we conclude that the plaintiff is entitled to recover the sum of $72,619.45, under Findings III, IY, V, VI, VIII, IX, X, XI, and XII, and judgment is awarded accordingly.
Hat, Judge; BaRney, Judge; Booth, Judge; and Campbell, GMef Justice, concur.